UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

TAMMI PHOENIX,                                                   :

                     Plaintiff,                        :                    14 Civ. 4164 (AJP)

               -against-                        :                    **OPINION AND ORDER**

CAROLYN W. COLVIN, Commissioner of                              :
Social Security,
                                      :

                 Defendant.                        :

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

**ANDREW J. PECK, United States Magistrate Judge:**

        Plaintiff Tammi Phoenix, represented by counsel (Binder & Binder), brings this action pursuant to § 205(g) of the Social Security Act, 42 U.S.C. § 405(g), challenging the final decision of the Commissioner of Social Security (the "Commissioner") denying her Social Security disability insurance benefits ("DIB") and Supplemental Security Income ("SSI") benefits. (Dkt. No. 1: Compl.) Presently before the Court are the parties' cross-motions for judgment on the pleadings pursuant to Fed. R. Civ. P. 12(c). (Dkt. No. 16: Phoenix Motion for Judgment on the Pleadings; Dkt. No. 20: Gov't Motion for Judgment on the Pleadings.) The parties have consented to decision of the case by a United States Magistrate Judge pursuant to 28 U.S.C. § 636(c). (Dkt. No. 9: Consent Form.)

        For the reasons set forth below, the Commissioner's motion (Dkt. No. 20) is GRANTED and Phoenix's motion (Dkt. No. 16) is DENIED.

## FACTS

### Procedural Background

        On April 14, 2011, Phoenix applied for DIB and SSI benefits, alleging disability

since February 1, 2008.  (Dkt. No. 14: Administrative Record ("R.") 129-39.)  On August 25, 2011, the Social Security Administration ("SSA") found that Phoenix was not disabled and denied her applications.  (R.  68-83.)  Phoenix requested a hearing.  (R. 84-85.)

On October 3, 2012, represented by counsel, Phoenix appeared at a hearing before Administrative Law Judge ("ALJ") James Kearns.  (R. 48-64.)  At the hearing, Phoenix amended her alleged onset date to July 1, 2010.  (R. 63.)  On October 18, 2012, ALJ Kearns found Phoenix not disabled.  (R. 29-40.)  ALJ Kearns' decision became the decision of the Commissioner on April 11, 2014 when the Appeals Council denied Phoenix's request for review.  (R. 1-5.)

The issue before the Court is whether the Commissioner's decision that Phoenix is not disabled is supported by substantial evidence.

**Non-Medical Evidence Before ALJ Kearns**

Phoenix, born on October 6, 1973, was thirty-nine years old at the time of ALJ Kearns' decision.  (R. 51-51, 129.)  Phoenix graduated high school.  (R. 53, 177.)  Phoenix last worked as a home care provider, and ceased working in 2007 when the patient she cared for was placed in a nursing home.  (R. 53, 177.)  Phoenix has past relevant work as an administrative coordinator, a receptionist, a groundskeeper, a home attendant, and a general clerical worker.  (R. 53-54, 61, 177, 196, 198-201.)

On May 31, 2011, Phoenix submitted an Adult Function Report (R. 183-204) in support of her claim for benefits in which she stated that she could follow written and spoken instructions (R. 190).  Phoenix reported no problems getting along with superiors and stated that she had never lost a job because of problems getting along with people.  (R. 190.)  She reported being able to handle her household finances.  (R. 187.)  Phoenix, however, also stated that she has problems paying attention and finishing what she starts, because she gets "tired, bored, and loose

motivation." (R. 190.)

At her hearing, Phoenix testified that since leaving her position as home attendant, she has been unable to work due to depression, panic attacks and side effects of her medication that leave her with drowsiness, insomnia and memory loss. (R. 54.) Phoenix testified that her depression caused her insomnia and that she sometimes had difficulty staying awake during the day. (R. 56.) Phoenix further testified that sometimes her anxiety and depression limited her interest in doing any activities or leaving her home. (R. 56, 58, 186.) Phoenix received monthly treatment from a social worker and her psychiatrist. (R. 55-56, 186, 188.)

Phoenix testified that she lives with her ten year old son, who she usually takes to school by subway each day. (R. 52, 56-57, 184.) A neighbor brings her son home from school. (R. 57.) On days when Phoenix is unable to get up because of her insomnia, her mother or a friend takes her son to school. (R. 56, 184.) Phoenix also attends appointments at her clinic and goes to the library. (R. 56, 188.) Phoenix testified that she has difficulty being around other people when she is having anxiety problems. (R. 56.) Phoenix cooks for her son except on her "bad" days. (R. 57, 185-86.) Sometimes Phoenix needs help washing dishes and cleaning her house. (R. 58.) Phoenix's mother does the grocery shopping, while her sister does the laundry. (R. 58, 187.) Phoenix finds that her medications are "sometimes" helpful. (R. 59.)

**Psychiatric Evidence Before ALJ Kearns**

On July 15, 2010, psychiatrist K. Mohamed and a social worker examined Phoenix on behalf of the Federation Employment and Guidance Service ("FEGS"). (R. 247-91.) Phoenix walked alone to the evaluation and stated that she was capable of using public transportation. (R. 258.) Phoenix stated that she could cook, wash dishes, clean and shop for groceries. (R. 258.) Phoenix registered a Personal Health Questionnaire ("PHQ-9 ") score of fifteen, the lower boundary

4

for "[m]oderately severe depression." (R. 232, 258.) Phoenix was not then receiving any mental health treatment. (R. 258, 285.) Phoenix reported that she "[i]s not interested in working." (R. 253.)

Dr. Mohamed found Phoenix well-groomed, cooperative and restless. (R. 282.) Phoenix reported mood swings, anxiety/fearfulness, needing to flee places, a depressed mood, an easy startle response and insomnia. (R. 281-82.) Phoenix disclosed that although she had been depressed for several years, she had stopped seeing a psychiatrist because she felt she was getting worse. (R. 282.) A mental status examination revealed restless activity, a constricted affect, slowed speech and a depressed mood. (R. 282.) Dr. Mohamed found Phoenix to have moderate limitations in her ability to follow work rules, relate to co-workers, accept supervision, adapt to change, deal with the public, adapt to stressful situations and maintain attention. (R. 283.) Dr. Mohamed diagnosed Phoenix with mood disorder, bipolar disorder NOS, and social phobia. (R. 284.) Phoenix had a current global assessment of functioning ("GAF") score of fifty and a GAF of seventy for the past year.[1] (R. 284.) Dr. Mohamed opined that Phoenix was temporarily disabled from work for three months. (R. 284.)

On October 1, 2010, treating psychiatrist Dr. Braham Harneja at Bronx Lebanon Hospital completed a "Treating Physician's Wellness Plan Report" for Phoenix. (R. 343-44.) Phoenix presented with a depressed mood and constricted affect but denied delusions, paranoia or hallucinations. (R. 343.) Dr. Harneja noted that Phoenix's thought process was coherent and her

---

[1]    A GAF score between forty-one and fifty indicates serious symptoms or any serious impairment in social, occupational or school functioning. Diagnostic & Statistical Manual of Mental Disorders at 32 (4th ed. 1994). A GAF score between fifty-one and sixty indicates moderate symptoms or moderate difficulty in social, occupational or school functioning. Id. A GAF of sixty-one to seventy represents some mild symptoms or some difficulty in social, occupational or school functioning. Id.

insight, judgment and impulse control were intact.  (R. 343.)  Dr. Harneja diagnosed Phoenix with recurrent major depressive disorder since September 8, 2010.  (R. 343.)  Phoenix was compliant with treatment.  (R. 343.)  Dr. Harneja prescribed Vistaril and Pristiq.  (R. 343.)  In Dr. Harneja's opinion, Phoenix had not been stabilized, and she would be unable to work for at least twelve months.  (R. 344.)

On February 24, 2011, Phoenix attended individual therapy at Bronx Lebanon Hospital, where she was seen by Dr. Harneja and clinical social worker Herman Punch.  (R. 329-30, 339, 341-42.)  Phoenix reported to Punch that she had some improvement in her mood.  (R. 329.)  A mental status examination showed Phoenix to have a normal mood and appropriate affect, impaired concentration, normal speech,  and moderate memory dysfunction.  (R. 329.)  Phoenix denied having any depressive symptoms.  (R. 329.)  Phoenix's thought process was logical, and her judgment, insight and  attention were intact.  (R. 329.)  In his "Treating Physician's Wellness Plan Report,"  Dr. Harneja noted that Phoenix was depressed but alert and that her insight, judgment and impulse control were all intact.  (R. 341.)  Dr. Harneja diagnosed Phoenix with depression and again opined that she was unable to work for at least twelve months.  (R. 342.)

On April 18, 2011, Phoenix had a follow-up visit with Dr. Harneja.  (R. 326-28.)  Phoenix reported feeling better but "down" one to two days a week and overwhelmed with housing problems.  (R. 326.)  Dr. Harneja's mental status exam found that Phoenix's mood was euthymic,[2] and her affect was calm and constricted.  (R. 326.)  Phoenix's attention, memory, judgment and insight were intact, and her thought process was logical and directed.  (R. 326.)  Dr. Harneja refilled

---

[2]    "Euthymia" is a state of mental tranquility and well-being that is neither manic nor depressed.  Dorland's Illustrated Medical Dictionary at 655 (32d ed. 2012).

Phoenix's medications.  (R. 326-27.)

On April 26, 2011, Phoenix returned for therapy with Punch and reported intermittent low mood, crying spells at times and self-imposed social isolation.  (R. 324-25.)  A mental status examination revealed Phoenix to have a depressed mood, a constricted affect, impaired concentration, forgetfulness and fair insight.  (R. 324.)  Phoenix reported that she had made unsuccessful efforts to find employment.  (R. 324.)

On May 1, 2011, Dr. Harneja completed a "Psychiatric/Psychological Impairment Questionnaire" (R. 292-99) in which he diagnosed Phoenix with mood disorder, not otherwise specified (R. 292).  Phoenix's GAF was sixty and had been sixty for the previous year.  (R. 292.)  Dr. Harneja noted that Phoenix had poor memory, mood disturbance, emotional lability, and difficulty thinking or concentrating.  (R. 293-94.)

Dr. Harneja opined that Phoenix was moderately limited in her ability to remember locations and work-like procedures; understand, remember and carry out simple one or two-step instructions; perform activities on a schedule, maintain regular attendance and be punctual with customary tolerance; ask simple questions or request assistance; and travel to unfamiliar places or use public transportation.  (R. 294-97.)  Dr. Harneja, however, found Phoenix markedly limited in her ability to understand, remember and carry out detailed instructions; sustain ordinary work without supervision; work in coordination with or proximity to others without being distracted by them; complete a normal workweek without interruptions from psychological symptoms and perform at a consistent pace without an unreasonable number and length of rest periods; interact appropriately with the general public; accept instructions and respond appropriately to criticism from supervisors; get along with co-workers or peers without distracting them or exhibiting behavior extremes; maintain socially appropriate behavior and adhere to basic standards of neatness and

cleanliness; respond appropriately to changes in the work setting; be aware of normal hazards and take appropriate precautions; and set realistic goals or make plans independently.  (R. 295-97.)  Dr. Harneja noted that Phoenix "report[ed]" experiencing "episodes of deterioration or decompensation" in her workplace because of irritability in accepting instructions and being around co-workers.  (R. 297.)  Dr. Harneja expected Phoenix's symptoms to persist for as least twelve months.  (R. 298.) Dr. Harneja estimated that Phoenix would be absent from work more than three times per month as a result of her impairments or treatment.  (R. 299.)

At a May 16, 2011 follow-up visit with Dr. Harneja, Phoenix reported her mood as "up and down," with intermittent low moods, anxiety alternating with mood swings, irritability and anger.  (R. 322-23.)  Phoenix's sleep and appetite were fair, her mood was euthymic, her affect was calm, and her thought process was logical and directed.  (R. 322.)  Phoenix's attention, memory, judgment and impulse control were intact.  (R. 322.)  Dr. Harneja renewed Phoenix's medications and added Abilify.  (R. 323.)  On May 27, 2011, Phoenix attended group therapy at Bronx Lebanon Hospital, where she spoke about her financial problems and the stress of owing back rent.  (R. 321.)

On June 1, 2011, Phoenix returned for individual therapy with Punch.  (R. 333.) Phoenix was making "incremental" progress although "psychosocial stressors, such as housing and financial issues, persist."  (R. 333.)  Phoenix reported feeling sad because of persistent difficulties paying her rent and expressed the need to find a job, which Punch encouraged.  (R. 333.)  Phoenix had a depressed mood,  a constricted affect, impaired concentration, forgetfulness and fair insight. (R. 333.)

On June 13, 2011, Phoenix saw Dr. Harneja again.  (R. 314-15.)  Phoenix reported feeling overwhelmed due to her son's behavior in school and financial problems.  (R. 314.)  Phoenix denied experiencing any side effects from medication and said that Abilify helped with her mood

swings and irritability.  (R. 314.)  Dr. Harneja's mental status exam showed Phoenix to be stressed and unhappy, with an irritable but "ok" mood and a constricted and frustrated affect.  (R. 314.) Phoenix's attention, memory, judgment and impulse control all were intact, and her reasoning was normal.  (R. 314.)  Dr. Harneja increased her dose of Abilify.  (R. 315, 332.)

On July 1, 2011, Phoenix returned to group therapy at Bronx Lebanon Hospital.  (R. 317.)  On July 5, 2011, Phoenix attended individual therapy with Punch, complaining of stress due to housing problems, her son's behavior and her pending mental examinations for SSI.  (R. 310-11.) Punch found Phoenix to have an anxious mood, impaired concentration and only fair impulse control.  (R. 310.)  Punch described Phoenix's memory as forgetful and diagnosed her with mood disorder, not otherwise specified and marijuana abuse, although Phoenix denied active marijuana use.  (R. 310.)

On July 14, 2011, Phoenix reported to Dr. Harneja that she was "feeling much better" after the adjustments to her medication, was less depressed, and denied mood swings or irritability. (R. 312-13, 331.)  Phoenix's attention and memory were intact, her thought process was logical, and her reasoning was normal.  (R. 312.)  Her mood was euthymic, her affect was calm, her insight and judgment were intact, and her impulse control was adequate.  (R. 312.)  Her sleep had improved. (R. 312.)

On July 15, 2011, consultative psychologist Dmitri Bougakov evaluated Phoenix. (R. 305-08.)  Phoenix described her symptoms to Dr. Bougakov as frequent difficulty falling asleep and waking, poor appetite, dysphoric moods, crying spells, loss of interest, irritability, low energy, concentration difficulties, diminished sense of pleasure and forgetfulness.  (R. 305.)  Phoenix stated that she was able to perform all of her chores on a daily basis, but that it was hard for her to get motivated due to low energy and body pains.  (R. 307.)  Phoenix was able to manage her money and

use public transit.  (R. 307-08.)  Phoenix's thought process was coherent and goal directed, but her mood was dysthymic and her affect dysphoric.  (R. 306.)  Her motor skills were mildly impaired and her cognitive functioning was average.  (R. 306.)  Dr. Bougakov diagnosed Phoenix with depressive and anxiety disorder NOS.  (R. 307.)

Dr. Bougakov opined that Phoenix could follow and understand simple directions and instructions, perform simple tasks, maintain attention and concentration, maintain a regular schedule and make appropriate decisions, but was somewhat limited in learning new tasks and performing complex tasks and had mild limitations in her ability to deal with others and deal with stress.  (R. 307.)  Phoenix's overall prognosis was fair, given that her "cognitive symptoms are relatively mild and she does not present with any significant psychiatric symptomatology."  (R. 308.)  Dr. Bougakov therefore "hoped with appropriate treatment [Phoenix] will be able to return to normal levels of functioning."  (R. 308.)  Dr. Bougakov concluded that the "[r]esults of the examination appear to be consistent with psychiatric problems, but in itself this does not appear to be significant enough to interfere with [Phoenix's] ability to function on a daily basis."  (R. 307.)

Treatment records from Dr. Harneja and Punch from July 2011 through October 2012 are not part of the administrative record.  (See Dkt. No. 17: Phoenix Br. at 5 n.10; Dkt. No. 21: Gov't Br. at 10.)  Dr. Harneja and Punch, however, did provide two additional opinions about Phoenix.

On December 2, 2011, Dr. Harneja and Punch completed another "Psychiatric/Psychological Impairment Questionnaire."  (R. 378-85.)  Phoenix's diagnosis remained mood disorder NOS and her GAF score was fifty-five.  (R. 378.)  Dr. Harneja and Punch noted that Phoenix had difficulty thinking or concentrating, mood disturbance, decreased energy, generalized persistent anxiety and sleep disturbance.  (R. 379.)

In their opinion, Phoenix was mildly limited in her ability to understand simple one

or two-step instructions and moderately limited in dealing appropriately with the general public, maintaining socially appropriate behavior and in responding appropriately to changes in the workplace. (R. 381-82.)  They further opined that Phoenix was moderately limited in her ability to remember locations and work-like procedures, to carry out simple one or two-step instructions, interact with the general public, ask simple questions or request assistance, maintain socially appropriate behavior and adhere basic standards of neatness and cleanliness, respond appropriately to changes in the work setting, be aware of normal hazards and take appropriate precautions, and travel to unfamiliar places or use public transportation.  (R.  381-83.)   Finally, they opined that Phoenix was markedly limited in her ability to understand, remember and carry out detailed instructions; maintain attention and concentration for extended periods; perform activities with a schedule, maintain regular attendance, and be punctual within customary tolerance; sustain ordinary work without supervision; work in coordination with or proximity to others without being distracted by them; complete a normal workweek without interruptions from psychological symptoms and perform at a consistent pace without an unreasonable number and length of rest periods; accept instructions and respond appropriately to criticism from supervisors; get along with co-workers or peers without distracting them or exhibiting behavior extremes; maintain socially appropriate behavior and adhere to basic standards of neatness and cleanliness; and set realistic goals or make plans independently.  (R. 381-83.)   They noted that Phoenix reported experiencing episodes of decompensation in work or work-like settings.  (R. 383.)  In particular, Phoenix reported having lost employment in the past due to irritability and difficulty with others in close proximity.  (R. 383.) They opined that Phoenix was capable of low stress work, but would be absent two to three times a month. (R. 384-85.)

On October 3, 2012, the day of her hearing, Phoenix submitted a letter from Punch

and Dr. Harneja, discussing Phoenix's treatment.  (R. 387-88.)  The letter stated that Phoenix continued to "regularly" receive treatment from Punch and Dr. Harneja, and largely restated their opinions from the December 2, 2011 questionnaire, including that Phoenix was capable of low stress work.  (R. 387-88.)

**Vocational Expert Testimony**

ALJ Kearns heard testimony form vocational expert Pat Green.  (R. 60-63, 122-23.) Green identified Phoenix's past work as either skilled (administrative coordinator) or semi-skilled (home attendant, general clerical).  (R. 61.)  Green testified that an individual of Phoenix's age, education, and work history who was limited to performing simple and repetitive tasks with no contact with the public and only occasional contact with coworkers and supervisors could not perform Phoenix's past work.  (R. 61-62.)  She testified that such an individual could work as an addresser, a sorter, and a stuffer, all unskilled sedentary jobs.  (R. 62.)  Green testified that these jobs existed in substantial numbers in the national and local economy.  (R. 62.)  Finally, in answer to a question by Phoenix's counsel, Green testified that an individual who was off-task fifteen percent of the day or  missed work two to three times per month could not perform any of those jobs.  (R. 62-63.)

**ALJ Kearns' Decision**

On October 12, 2012, ALJ Kearns issued a written decision denying Phoenix's application for benefits.  (R. 29-40.)  ALJ Kearns followed a five-step analysis, considering Phoenix's testimony and the medical record.  (R. 33-40.) First, ALJ Kearns found that Phoenix "has not engaged in substantial gainful activity since July 1, 2010, the amended alleged onset date." (R. 34.)  Second, ALJ Kearns found that Phoenix had "the following severe impairments: depression and anxiety."  (R. 34.)  ALJ Kearns noted "[t]hese impairments are shown to result in vocationally

significant limitations and have lasted at a 'severe' level for a continuous period of more than 12 months." (R. 34.)

At the third step, ALJ Kearns determined that Phoenix "does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1." (R. 34.)  According the ALJ Kearns:

> No treating or examining physician has mentioned findings that are the same or equivalent in severity to the criteria of any listed impairment, nor does the evidence show signs or findings that are the same or equivalent to those of any listed impairment.  I paid particular attention to Listings Sections 12.04 (Affective Disorders) and 12.06 (Anxiety-Related Disorders).

> [Phoenix] has the following degree of limitation in the broad areas of functioning set out in the Mental Disorders Listing Sections in 20 CFR, Part 404, Subpart P, Appendix 1: mild restriction in activities of daily living, mild difficulties in maintaining social functioning, moderate difficulties in maintaining concentration, persistence or pace, and no episodes of decompensation, each of extended duration.

> The record does show that she has tested as having somewhat impaired concentration; she has reported that she is independent in activities of daily living; there are no debilitating social functioning issues, such as agoraphobia or panic attacks when exposed to crowds in the record; and she has had no suicide attempts, manic episodes, nervous breakdowns or any psychiatric hospitalizations that would constitute a decompensation for an extended period of time.

> In this case, the evidence fails to establish the presence of the "paragraph C" criteria because there is no evidence that the claimant experiences repeated episodes of decompensation, a residual disease process barring an increase in mental demands or an inability to function outside a highly supportive living environment.

(R. 35.)

ALJ Kearns found that Phoenix "has the residual functional capacity to perform work at all exertion levels but only simple and repetitive tasks, no contact with the public and only occasional contact with supervisors and coworkers." (R. 35.)  In making his residual functional capacity determination, ALJ Kearns found that "[t]he record reflects that [Phoenix] reports a history of depression and anxiety since at least 2003." (R. 36.)

In evaluating Phoenix's credibility, ALJ Kearns found that:

[Phoenix] was not fully credible to the extent that she felt her psychological impairments prevented her from working. Phoenix certified in her May 31, 2011 Adult Function Report that she could follow spoken and written instructions, has no problems getting along with authority figures and she had never lost her job due to problems getting along with people.

She stated at her July 15, 2010 FEGS biopsychosocial examination that she can perform all activities of daily living and personal care. She also told a FEGS social worker . . . that she was not interested in working . . . . The record shows that [Phoenix] has no limitations with respect to traveling independently, managing money and caring for her children.

[Phoenix's] treatment record[] primarily consists of the same essentially normal mental status examinations through 2011 and a one-time FEGS examination in 2010. Despite the fact that she [stated] throughout the examinations that depression and anxiety prevent her from functioning, she usually attributed her psychological symptoms to life stressors.

(R. 37, record citations omitted.)

ALJ Kearns gave little weight to the opinions of Dr. Harneja and Dr. Mohamed, except to the extent that Dr. Mohamed opined that Phoenix was only temporarily disabled. (R. 37-38.) According to ALJ Kearns:

Dr. Braham Harneja's May 1, 2011 opinion that [Phoenix] has multiple marked limitations in several mental-related work activities and any stressful situation will cause [Phoenix] to decompensate is given little weight since nothing in the record shows that she has actually decompensated or exhibited any kind of marked mental [disability] despite reporting psychosocial stressors including problems with her children, financial and housing issues, in addition to the fact that her benign mental status examinations have never revealed objective evidence of a marked impairment that may impact her ability to perform work activities.

(R. 37-38, record citations omitted.)

ALJ Kearns went on to find that Dr. Mohamed's and Dr. Harneja's "shared opinion that [Phoenix is] unable to work is given little weight since it is contradicted by a record showing essentially normal mental status examinations, [Phoenix's] independence in activities of daily living

and [Phoenix's] ability to care for a minor child."  (R. 38, record citations omitted.)  Finally, ALJ Kearns stated the he found Dr. Mohamed's disability opinion consistent with the examination results "to the extent that [Dr. Mohamed] felt [Phoenix] was <u>temporarily</u> unable to work" and noted that "Dr. Mohamed assessed [Phoenix] as having only moderate mental limitations."  (R. 38.)

ALJ Kearns also gave little weight to Punch's opinion from his October 3, 2012 joint letter with Dr. Harneja on the ground that, as a social worker, Punch "is not an acceptable medical source withing the meaning of 20 CFR 404.1513(d) and 20 CFR 416.913(d)."  (R. 38.)  ALJ Kearns noted that he nonetheless "did take into account the fact that Mr. Punch suggested that [Phoenix] was capable of tolerating only low work stress, which is accounted for in the residual functional capacity."  (R. 38.)

At the fourth step, ALJ Kearns found that Phoenix "is incapable of performing her past relevant jobs because they are too mentally demanding."  (R. 38.)  In doing so, ALJ Kearns specified that he took into consideration both his own residual functional capacity determination and Green's testimony as a vocational expert.  (R. 38.)

In the final step, ALJ Kearns found that "[c]onsidering [Phoenix's] age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that [Phoenix] can perform." (R. 39, citations omitted.)  In making that finding, ALJ Kearns noted that Phoenix's "ability to perform all or substantially all of the requirements of all exertional work levels has been impeded by additional limitations."  (R. 39.)  ALJ Kearns therefore relied on Green's testimony to find that Phoenix could work in sedentary jobs as an addresser, sorter or stuffer.  (R. 39.)  ALJ Kearns concluded that Phoenix had not been disabled from July 1, 2010 through the date of his decision.  (R. 40.)

On December 5, 2012, Phoenix requested review by the Appeals Council.  (R. 28.)

**Additional Evidence Phoenix Submitted To The Appeals Council**

Beginning prior to the onset of Phoenix's disability, she was seen periodically by treating internist Dr. Arthur Dove.  (R. 397-477.)  Records from Dr. Dove were not available to ALJ Kearns at the time of his decision, despite attempts by the SSA to obtain them.  (R. 353; see Dkt. No. 17: Phoenix Br. at 5 n.11; Dkt. No. 21: Gov't Br. at 11 n.12.)[3/]  Between Phoenix's amended onset date for her alleged disability through the date of ALJ Kearns' decision, there are three examination records from Dr. Dove.  (R. 397-405.)

On June 22, 2011, Dr. Dove completed a "Multiple Impairment Questionnaire."  (R. 389-95.)  Phoenix's primary symptoms were loss of energy and anorexia/weight loss, with moderate fatigue that Phoenix rated between four and six on a ten-point scale.  (R. 390-91.)  Dr. Dove diagnosed Phoenix with "depression/anxiety/anorexia," failure to thrive and insomnia.  (R. 389.)  Dr. Dove found that Phoenix had "moderate" fatigue. (R. 391-92.)  Dr. Dove estimated that Phoenix would be absent from work, on average, more than three times per month due to her impairments or treatment.  (R. 394.)  Dr. Dove stated that Phoenix's difficulty sleeping contributed to the severity of her limitations.  (R. 394.)  Dr. Dove opined that Phoenix was capable of low-stress work, her symptoms would not be increased in a competitive work environment, and her impairments would not last more than twelve months.  (R. 394.)  Dr. Dove opined that Phoenix's prognosis was "good." (R. 389.)  Dr. Dove found Phoenix capable of low-stress work.  (R. 394.)

On May 9, 2012, Phoenix saw Dr. Dove for her annual examination.  (R. 403-04.)  Phoenix reported that she was sleeping well and was not anxious.  (R. 404.)  Dr. Dove did not make

---

[3/]     An October 1, 2012 letter from Phoenix's counsel to the ALJ made no mention of Dr. Dove (see R. 228-31),  and neither Phoenix nor her counsel requested at her hearing that ALJ Kearns obtain evidence from Dr. Dove (see R. 51, 63; see also Gov't Br. at 11 n. 12.)

any psychological findings about Phoenix.  (R. 403-04.)

On September 10, 2012, Phoenix complained to Dr. Dove of digestive problems and anxiety.  (R. 397-98.)  Dr. Dove assessed Phoenix as having anxiety disorder and depressive disorder, but reported no other mental status findings.  (R. 397.)

On February 15, 2013, examining psychiatrist James Lynch evaluated Phoenix at the request of Binder & Binder.  (R. 9-19.)  Phoenix reported to Dr. Lynch that she stopped working in 2007 due to her depression and because she was no longer needed to care for her client.  (R. 17.)  Dr. Lynch reviewed Phoenix's treatment records from Bronx Lebanon Hospital and from Dr. Dove.  (R. 17-18.)  A mental health status examination of Phoenix revealed a flat affect and a regressed, limited and poor outlook.  (R. 18.)  Dr. Lynch diagnosed Phoenix with recurrent and chronic major depressive disorder and rated her "degree of disability [as] moderate to severe."  (R. 18.)  Dr. Lynch noted that Phoenix continued to suffer persistent depression with sleep disturbance, social isolation, and serious loss of interests.  (R. 18.)  Dr. Lynch opined that Phoenix was unable to perform any meaningful work due to her impairments.  (R. 18-19.) Dr. Lynch summed up his findings:

> In summary, Tammi Phoenix is a young woman who has been in treatment for a severe and persistent mental illness, depression, for the past five years.  Despite effective treatment, she continues to experience symptoms of depression with sleep disturbance, social isolation and serious loss of interest.
>
> Although [Phoenix] has not required hospitalization or emergency treatment for her illness, she is disabled, in my opinion.  Her symptoms prevent her from working in any meaningful capacity as she cannot function with poor sleep and inability in interacting socially and a severe lack of response to stress.  It is my medical opinion, within a reasonable degree of certainty, that [Phoenix] is disabled and cannot work in any meaningful capacity.

(R. 18-19.)

Dr. Lynch simultaneously completed a Psychiatric/Psychological Impairment Questionnaire on February 19, 2013.  (R. 9-16.)  Dr. Lynch reported a GAF score of fifty-five for

Phoenix and noted that during the past year she had a low of 50.  (R. 9.)  Dr. Lynch's clinical findings included sleep disturbance, mood disturbance, emotional lability, a blunt, flat or inappropriate affect, decreased energy, anhedonia, psychomotor agitation or retardation, paranoia or inappropriate suspiciousness, feelings of guilt and worthlessness and difficulty thinking or concentrating.  (R. 10.)  Phoenix's primary symptoms were anhedonia, insomnia and depression.  (R. 11.)  Dr. Lynch found Phoenix's symptoms and functional limitations reasonably consistent with her physical and emotional impairments described in his evaluation.  (R. 11.)  Dr. Lynch opined that those symptoms and limitations had been present for a number of years and were not expected to improve.  (R. 16.)  Dr. Lynch estimated that, on average, Phoenix likely would miss work more than three times per month as a result of her impairments or treatment.  (R. 16.)  Nonetheless, Dr. Lynch stated that Phoenix was capable of low-stress work.  (R. 15.)

**The Appeals Council's Decision**

On April 11, 2014, the Appeals Council denied Phoenix  review.  (R. 1-5.)  In reaching that decision, the Appeals Council noted that it had considered the "medical source statement (3 pages) and an impairment questionnaire (8 pages)" from Dr. Lynch.  (R. 2.)  The Appeals Council found that the ALJ decided Phoenix's case through "October 18, 2012.  This new information is about a later time.  Therefore, it does not affect the decision about whether [Phoenix was] disabled beginning on or before October 18, 2012."  (R. 2.)  With regard to Dr. Dove's records, the Appeals Council noted only that "this information does not provide a basis for changing the [ALJ's] decision."  (R. 2.)  Therefore, ALJ Kearns' decision became the final decision of the Commissioner in Phoenix's case.

<u>ANALYSIS</u>

**I.      THE APPLICABLE LAW**

**A.      Definition Of Disability**

A person is considered disabled for Social Security benefits purposes when he is unable "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A); <u>see</u>, <u>e.g.</u>, Barnhart v. <u>Thomas</u>, 540 U.S. 20, 23, 124 S. Ct. 376, 379 (2003); <u>Barnhart</u> v. <u>Walton</u>, 535 U.S. 212, 214, 122 S. Ct. 1265, 1268 (2002); <u>Impala</u> v. <u>Astrue</u>, 477 F. App'x 856, 857 (2d Cir. 2012).[4/]

> An individual shall be determined to be under a disability only if [the combined effects of] his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy, regardless of whether such work exists in the immediate area in which he lives, or whether a specific job vacancy exists for him, or whether he would be hired if he applied for work.

42 U.S.C. §§ 423(d)(2)(A), 1382c(a)(3)(B); <u>see</u>, <u>e.g.</u>, Barnhart v. <u>Thomas</u>, 540 U.S. at 23, 124 S. Ct. at 379; <u>Barnhart</u> v. <u>Walton</u>, 535 U.S. at 218, 122 S. Ct. at 1270; <u>Salmini</u> v. <u>Comm'r of Soc. Sec.</u>, 371 F. App'x at 111; <u>Betances</u> v. <u>Comm'r of Soc. Sec.</u>, 206 F. App'x at 26; <u>Butts</u> v. <u>Barnhart</u>, 388

---

[4/]      <u>See also</u>, <u>e.g.</u>, <u>Salmini</u> v. <u>Comm'r of Soc. Sec.</u>, 371 F. App'x 109, 111 (2d Cir. 2010); <u>Betances</u> v. <u>Comm'r of Soc. Sec.</u>, 206 F. App'x 25, 26 (2d Cir. 2006); <u>Surgeon</u> v. <u>Comm'r of Soc. Sec.</u>, 190 F. App'x 37, 39 (2d Cir. 2006); <u>Rodriguez</u> v. <u>Barnhart</u>, 163 F. App'x 15, 16 (2d Cir. 2005); <u>Malone</u> v. <u>Barnhart</u>, 132 F. App'x 940, 941 (2d Cir. 2005); <u>Butts</u> v. <u>Barnhart</u>, 388 F.3d 377, 383 (2d Cir. 2004), <u>amended on other grounds</u>, 416 F.3d 101 (2d Cir. 2005); <u>Veino</u> v. <u>Barnhart</u>, 312 F.3d 578, 586 (2d Cir. 2002); <u>Draegert</u> v. <u>Barnhart</u>, 311 F.3d 468, 472 (2d Cir. 2002); <u>Shaw</u> v. <u>Chater</u>, 221 F.3d 126, 131 (2d Cir. 2000); <u>Brown</u> v. <u>Apfel</u>, 174 F.3d 59, 62 (2d Cir. 1999); <u>Rosa</u> v. <u>Callahan</u>, 168 F.3d 72, 77 (2d Cir. 1999); <u>Tejada</u> v. <u>Apfel</u>, 167 F.3d 770, 773 (2d Cir. 1999); <u>Balsamo</u> v. <u>Chater</u>, 142 F.3d 75, 79 (2d Cir. 1998); <u>Perez</u> v. <u>Chater</u>, 77 F.3d 41, 46 (2d Cir. 1996).

F.3d at 383; Draegert v. Barnhart, 311 F.3d at 472.[5]

In determining whether an individual is disabled for disability benefit purposes, the Commissioner must consider: "(1) the objective medical facts; (2) diagnoses or medical opinions based on such facts; (3) subjective evidence of pain or disability testified to by the claimant or others; and (4) the claimant's educational background, age, and work experience." Mongeur v. Heckler, 722 F.2d 1033, 1037 (2d Cir. 1983) (per curiam).[6]

**B.    Standard Of Review**

A court's review of the Commissioner's final decision is limited to determining whether there is "substantial evidence" in the record as a whole to support such determination. E.g., 42 U.S.C. § 405(g); Giunta v. Comm'r of Soc. Sec., 440 F. App'x 53, 53 (2d Cir. 2011).[7] "'Thus, the role of the district court is quite limited and substantial deference is to be afforded to the Commissioner's decision.'" Morris v. Barnhart, 02 Civ. 0377, 2002 WL 1733804 at *4 (S.D.N.Y.

---

[5]    See also, e.g., Shaw v. Chater, 221 F.3d at 131-32; Rosa v. Callahan, 168 F.3d at 77; Balsamo v. Chater, 142 F.3d at 79.

[6]    See, e.g., Brunson v. Callahan, No. 98-6229, 199 F.3d 1321 (table), 1999 WL 1012761 at *1 (2d Cir. Oct. 14, 1999); Brown v. Apfel, 174 F.3d at 62.

[7]    See also, e.g., Prince v. Astrue, 514 F. App'x 18, 19 (2d Cir. 2013); Salmini v. Comm'r of Soc. Sec., 371 F. App'x 109, 111 (2d Cir. 2010); Acierno v. Barnhart, 475 F.3d 77, 80-81 (2d Cir.), cert. denied, 551 U.S. 1132, 127 S. Ct. 2981 (2007); Halloran v. Barnhart, 362 F.3d 28, 31 (2d Cir. 2004); Jasinski v. Barnhart, 341 F.3d 182, 184 (2d Cir. 2003); Veino v. Barnhart, 312 F.3d 578, 586 (2d Cir. 2002); Shaw v. Chater, 221 F.3d 126, 131 (2d Cir. 2000); Brown v. Apfel, 174 F.3d 59, 61 (2d Cir. 1999); Rosa v. Callahan, 168 F.3d 72, 77 (2d Cir. 1999); Tejada v. Apfel, 167 F.3d 770, 773 (2d Cir. 1999); Perez v. Chater, 77 F.3d 41, 46 (2d Cir. 1996); Rivera v. Sullivan, 923 F.2d 964, 967 (2d Cir. 1991); Mongeur v. Heckler, 722 F.2d 1033, 1038 (2d Cir. 1983) (per curiam); Dumas v. Schweiker, 712 F.2d 1545, 1550 (2d Cir. 1983).

July 26, 2002) (Peck, M.J.).[8/]

The Supreme Court has defined "substantial evidence" as "'more than a mere scintilla [and] such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" Richardson v. Perales, 402 U.S. 389, 401, 91 S. Ct. 1420, 1427 (1971); accord, e.g., Selian v. Astrue, 708 F.3d 409, 417 (2d Cir. 2013); Rosa v. Callahan, 168 F.3d at 77; Tejada v. Apfel, 167 F.3d at 773-74.[9/] "[F]actual issues need not have been resolved by the [Commissioner] in accordance with what we conceive to be the preponderance of the evidence." Rutherford v. Schweiker, 685 F.2d 60, 62 (2d Cir. 1982), cert. denied, 459 U.S. 1212, 103 S. Ct. 1207 (1983).  The Court must be careful not to "'substitute its own judgment for that of the [Commissioner], even if it might justifiably have reached a different result upon a de novo review.'" Jones v. Sullivan, 949 F.2d 57, 59 (2d Cir. 1991).[10/]

The Court, however, will not defer to the Commissioner's determination if it is "'the product of legal error.'" E.g., Duvergel v. Apfel, 99 Civ. 4614, 2000 WL 328593 at *7 (S.D.N.Y. Mar. 29, 2000) (Peck, M.J.); see also, e.g., Douglass v. Astrue, 496 F. App'x 154, 156 (2d Cir. 2012); Butts v. Barnhart, 388 F.3d 377, 384 (2d Cir. 2004), amended on other grounds, 416 F.3d 101 (2d Cir. 2005); Tejada v. Apfel, 167 F.3d at 773 (citing cases).

---

[8/]   See also, e.g., Florencio v. Apfel, 98 Civ. 7248, 1999 WL 1129067 at *5 (S.D.N.Y. Dec. 9, 1999) (Chin, D.J.) ("The Commissioner's decision is to be afforded considerable deference; the reviewing court should not substitute its own judgment for that of the Commissioner, even if it might justifiably have reached a different result upon a de novo review." (quotations & alterations omitted)).

[9/]   See also, e.g., Halloran v. Barnhart, 362 F.3d at 31; Jasinski v. Barnhart, 341 F.3d at 184; Veino v. Barnhart, 312 F.3d at 586; Shaw v. Chater, 221 F.3d at 131; Brown v. Apfel, 174 F.3d at 61; Perez v. Chater, 77 F.3d at 46.

[10/]   See also, e.g., Campbell v. Astrue, 465 F. App'x 4, 6 (2d Cir. 2012); Veino v. Barnhart, 312 F.3d at 586.

The Commissioner's regulations set forth a five-step sequence to be used in evaluating disability claims.  20 C.F.R. §§ 404.1520, 416.920; see, e.g., Barnhart v. Thomas, 540 U.S. 20, 24-25, 124 S. Ct. 376, 379-80 (2003); Bowen v. Yuckert, 482 U.S. 137, 140, 107 S. Ct. 2287, 2291 (1987).  The Supreme Court has articulated the five steps as follows:

> Acting pursuant to its statutory rulemaking authority, the agency has promulgated regulations establishing a five-step sequential evaluation process to determine disability.  If at any step a finding of disability or nondisability can be made, the SSA will not review the claim further.  [1] At the first step, the agency will find nondisability unless the claimant shows that he is not working at a "substantial gainful activity."  [2] At step two, the SSA will find nondisability unless the claimant shows that he has a "severe impairment," defined as "any impairment or combination of impairments which significantly limits [the claimant's] physical or mental ability to do basic work activities."  [3] At step three, the agency determines whether the impairment which enabled the claimant to survive step two is on the list of impairments presumed severe enough to render one disabled; if so, the claimant qualifies.  [4] If the claimant's impairment is not on the list, the inquiry proceeds to step four, at which the SSA assesses whether the claimant can do his previous work; unless he shows that he cannot, he is determined not to be disabled.  [5] If the claimant survives the fourth stage, the fifth, and final, step requires the SSA to consider so-called "vocational factors" (the claimant's age, education, and past work experience), and to determine whether the claimant is capable of performing other jobs existing in significant numbers in the national economy.

Barnhart v. Thomas, 540 U.S. at 24-25, 124 S. Ct. at 379-80 (fns. & citations omitted); accord, e.g., Talavera v. Astrue, 697 F.3d 145, 151 (2d Cir. 2012); Rosa v. Callahan, 168 F.3d at 77; Tejada v. Apfel, 167 F.3d at 774.[11/]

The claimant bears the burden of proof as to the first four steps; if the claimant meets the burden of proving that he cannot return to his past work, thereby establishing a prima facie case, the Commissioner then has the burden of proving the last step, that there is other work the claimant

---

[11/]    See also, e.g., Jasinski v. Barnhart, 341 F.3d at 183-84; Shaw v. Chater, 221 F.3d at 132; Brown v. Apfel, 174 F.3d at 62; Balsamo v. Chater, 142 F.3d 75, 79-80 (2d Cir. 1998); Perez v. Chater, 77 F.3d at 46; Dixon v. Shalala, 54 F.3d 1019, 1022 (2d Cir. 1995); Berry v. Schweiker, 675 F.2d 464, 467 (2d Cir. 1982).

can perform considering not only his medical capacity but also his age, education and training.  See,

e.g., Barnhart v. Thomas, 540 U.S. at 25, 124 S. Ct. at 379-80.[12/]

     **C.**     **The Treating Physician Rule**

     The "treating physician's rule" is a series of regulations set forth by the Commissioner

in 20 C.F.R. § 404.1527 detailing the weight to be accorded a treating physician's opinion.

Specifically, the Commissioner's regulations provide that:

> If we find that a treating source's opinion on the issue(s) of the nature and severity
> of your impairment(s) is well-supported by medically acceptable clinical and
> laboratory diagnostic techniques and is not inconsistent with the other substantial
> evidence in your case record, we will give it controlling weight.

20 C.F.R. § 404.1527(c)(2); see, e.g., Rugless v. Comm'r of Soc. Sec., 548 F. App'x 698, 699-700

(2d Cir. 2013); Meadors v. Astrue, 370 F. App'x 179, 182 (2d Cir. 2010); Colling v. Barnhart, 254

F. App'x 87, 89 (2d Cir. 2007); Lamorey v. Barnhart, 158 F. App'x 361, 362 (2d Cir. 2006).

     Further, the regulations specify that when controlling weight is not given a treating

physician's opinion (because it is not "well-supported" by other medical evidence), the ALJ must

consider the following factors in determining the weight to be given such an opinion: (1) the length

of the treatment relationship and the frequency of examination; (2) the nature and extent of the

treatment relationship; (3) the evidence that supports the treating physician's report; (4) how

consistent the treating physician's opinion is with the record as a whole; (5) the specialization of the

physician in contrast to the condition being treated; and (6) any other factors which may be

significant. 20 C.F.R. § 404.1527(c) (2)-(6); see, e.g., Cichocki v. Astrue, 534 F. App'x 71, 74 (2d

---

[12/]    See also, e.g., Selian v. Astrue, 708 F.3d at 418; Betances v. Comm'r of Soc. Sec., 206 F.
App'x 25, 26 (2d Cir. 2006); Green-Younger v. Barnhart, 335 F.3d 99, 106 (2d Cir. 2003);
Rosa v. Callahan, 168 F.3d at 80; Perez v. Chater, 77 F.3d at 46; Berry v. Schweiker, 675
F.2d at 467.

Cir. 2013); Gunter v. Comm'r of Soc. Sec., 361 F. App'x 197, 197 (2d Cir. 2010); Foxman v.

Barnhart, 157 F. App'x 344, 346-47 (2d Cir. 2005); Halloran v. Barnhart, 362 F.3d 28, 32 (2d Cir.

2004); Shaw v. Chater, 221 F.3d 126, 134 (2d Cir. 2000); Clark v. Comm'r of Soc. Sec., 143 F.3d

115, 118 (2d Cir. 1998); Schaal v. Apfel, 134 F.3d 496, 503 (2d Cir. 1998).

        When a treating physician provides a favorable report, the claimant "is entitled to an

express recognition from the [ALJ or] Appeals Council of the existence of [the treating physician's]

favorable . . . report and, if the [ALJ or] Council does not credit the findings of that report, to an

explanation of why it does not."   Snell v. Apfel, 177 F.3d 128, 134 (2d Cir. 1999); see, e.g.,

Cichocki v. Astrue, 534 F. App'x at 75; Zabala v. Astrue, 595 F.3d 402, 409 (2d Cir. 2010) (ALJ's

failure to consider favorable treating physician evidence ordinarily requires remand pursuant to

Snell but does not require remand where the report was "essentially duplicative of evidence

considered by the ALJ"); Ferraris v. Heckler, 728 F.2d 582, 587 (2d Cir. 1984) ("We of course do

not suggest that every conflict in a record be reconciled by the ALJ or the Secretary, but we do

believe that the crucial factors in any determination must be set forth with sufficient specificity to

enable [reviewing courts] to decide whether the determination is supported by substantial evidence."

(citations omitted)); Ramos v. Barnhart, 02 Civ. 3127, 2003 WL 21032012 at *7, *9 (S.D.N.Y. May

6, 2003) (The ALJ's "'failure to mention such [treating physician report] evidence and set forth the

reasons for his conclusions with sufficient specificity hinders [this Court's] ability . . . to decide

whether his determination is supported by substantial evidence.'").

        The Commissioner's "treating physician" regulations were approved by the Second

Circuit in Schisler v. Sullivan, 3 F.3d 563, 568 (2d Cir. 1993).

II.      **APPLICATION OF THE FIVE-STEP SEQUENCE TO PHOENIX'S CLAIM**

    A.    **Phoenix Was Not Engaged In Substantial Gainful Activity**

        The first inquiry is whether Phoenix was engaged in substantial gainful activity after her application for DIB and SSI benefits.  "Substantial gainful activity" is defined as work that involves "doing significant and productive physical or mental duties" and "[i]s done (or intended) for pay or profit."  20 C.F.R.  § 404.1510.  Since ALJ Kearns' conclusion that Phoenix did not engage in substantial gainful activity during the applicable time period (see page 11 above) is not disputed and benefits Phoenix, the Court proceeds to the second step of the five-step analysis.

    B.    **Phoenix Demonstrated "Severe" Impairments That Significantly Limited Her Ability To Do Basic Work Activities**

        The second step of the analysis is to determine whether Phoenix proved that she had a severe impairment or combination of impairments that "significantly limit[ed her] physical or mental ability to do basic work activities." 20 C.F.R. § 404.1521(a).  The ability to do basic work activities is defined as "the abilities and aptitudes necessary to do most jobs."  20 C.F.R. § 404.1521(b). "Basic work activities" include:

> walking, standing, sitting, lifting, pushing, pulling, reaching, carrying, or handling . . . seeing, hearing, and speaking . . . [u]nderstanding, carrying out, and remembering simple instructions . . . [u]se of judgment . . . [r]esponding appropriately to supervision, co-workers and usual work situations . . . [d]ealing with changes in a routine work setting.

20 C.F.R. § 404.1521(b)(1)-(6).

        ALJ Kearns found that Phoenix's depression and anxiety constituted severe impairments.  (See page 11 above.)  ALJ Kearns' finding regarding the severity of Phoenix's impairments benefits Phoenix, and the Court therefore proceeds to the third step of the five-part analysis.

**C.**     **Phoenix Did Not Have A Disability Listed In Appendix 1 Of The Regulations**

The third step of the five-step test requires a determination of whether Phoenix had

an impairment listed in Appendix 1 of the Regulations.  20 C.F.R., Pt. 404, Subpt. P, App. 1.  "These

are impairments acknowledged by the [Commissioner] to be of sufficient severity to preclude

gainful employment.  If a claimant's condition meets or equals the 'listed' impairments, he or she is

conclusively presumed to be disabled and entitled to benefits."  Dixon v. Shalala, 54 F.3d 1019,

1022 (2d Cir. 1995).

ALJ Kearns found that notwithstanding her severe depression and anxiety, Phoenix

"does not have an impairment or combination of impairments that meets or medically equals the

severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1."  (See page

12 above.)  In making that determination, ALJ Kearns "paid particular attention to Listing Sections

12.04 (Affective Disorders) and 12.06 (Anxiety-Related disorders)."  (See page 12 above.)  Phoenix

is represented by experienced counsel and does not claim that any of her impairments meet or equal

a listed condition.  (See generally Dkt. No. 17: Phoenix Br.; Dkt. No. 22: Phoenix Reply Br.)  The

Court therefore proceeds with the five-step analysis.

**D.**     **The ALJ's Residual Functional Capacity And Credibility Determinations**

**1.**     **Residual Functional Capacity**

ALJ Kearns found that Phoenix "has the residual functional capacity to perform work

at all exertion levels but only simple and repetitive tasks, no contact with the public and only

occasional contact with supervisors and coworkers." (R. 35; see page 12 above.)  In reaching that

conclusion, ALJ Kearns largely rejected the opinions of Phoenix's treating psychiatrists.  According

to ALJ Kearns:

Dr. Braham Harneja's May 1, 2011 opinion that [Phoenix] has multiple marked

> limitations in several mental-related work activities and any stressful situation will
> cause [Phoenix] to decompensate is given little weight since nothing in the record
> shows that she has actually decompensated or exhibited any kind of marked mental
> [disability] despite reporting psychosocial stressors including problems with her
> children, financial and housing issues, in addition to the fact that her benign mental
> status examinations have never revealed objective evidence of a marked impairment
> that may impact her ability to perform work activities.

(R. 37-38; <u>see</u> page 13 above.)  ALJ Kearns went on to find that Dr. Mohamed's and Dr. Harneja's

"shared opinion that [Phoenix is] unable to work is given little weight since it is contradicted by a

record showing essentially normal mental status examinations, [Phoenix's] independence in

activities of daily living, and [Phoenix's] ability to care for a minor child." (R. 38; <u>see</u> pages 13-14

above.)  Finally, ALJ Kearns found Dr. Mohamed's examination results consistent with the doctor's

disability opinion "to the extent that [Dr. Mohamed] felt [Phoenix] was <u>temporarily</u> unable to work."

(R. 38 (emphasis in original); <u>see</u> page 14 above.)

Phoenix contends that the ALJ's functional capacity determination violated the

treating physician rule by failing to give proper weight to Dr. Harneja's opinion and by erroneously

relying on examining psychiatrist Dr. Mohamed's finding that Phoenix was only temporarily

disabled. (Dkt. No. 17: Phoenix Br. at 10-14.)  Phoenix further argues that "[t]he opinions from one-

time examining sources are not entitled to significant weight when contradicted by well-supported

opinions from a treating specialist." (Phoenix Br. at 13.)  Phoenix also argues that ALJ Kearns erred

by not specifically weighing Dr. Harneja's opinion according to "'all of the factors provided in 20

CFR 404.1527 and 416.927.'"  (Phoenix Br. at 14-15.)  According to Phoenix, "[t]he ALJ's failure

to weigh Dr. Harneja's opinions under these factors or give other good reasons for rejecting the

treating specialist's findings was not harmless as every factor supports deference to the treating

doctor. " (Phoenix Br. at 15.)

None of Phoenix's arguments are persuasive.  Even though "the treating physician

rule generally requires deference to the medical opinion of a claimant's treating physician, the opinion of the treating physician is not afforded controlling weight where . . . the treating physician issued opinions that are not consistent with other substantial evidence in the record, such as the opinions of other medical experts." Halloran v. Barnhart, 362 F.3d 28, 32 (2d Cir. 2004) (citation omitted).[13/] Furthermore, "the opinion of a treating physician, or any doctor, that the claimant is 'disabled' or 'unable to work' is not controlling," since such statements are not medical opinions, but rather "opinions on issues reserved to the Commissioner." Mack v. Comm'r of Soc. Sec., 12 Civ. 186, 2013 WL 5425730 at *8 (S.D.N.Y. Sept. 27, 2013); 20 C.F.R. §§ 404.1527(d)(1), 416.927(d)(1).[14/] Moreover, in rejecting a treating physician's opinion, an ALJ need not expressly enumerate each factor considered if the ALJ's reasoning and adherence to the treating physician rule is clear. See, e.g., Atwater v. Astrue, 512 F. App'x 67, 70 (2d Cir. 2013) (plaintiff "challenges the ALJ's failure to review explicitly each factor provided in 20 C.F.R. § 404.1527(c).  We require no

---

[13/]     Accord, e.g., Penfield v. Colvin, 563 F. App'x 839, 840 (2d Cir. 2014); Petrie v. Astrue, 412 F. App'x 401, 405 (2d Cir. 2011); Kennedy v. Astrue, 343 F. App'x 719, 721 (2d Cir. 2009); Veino v. Barnhart, 312 F.3d 578, 588 (2d Cir. 2002) ("While the opinions of a treating physician deserve special respect, they need not be given controlling weight where they are contradicted by other substantial evidence in the record." (citations omitted)); Snell v. Apfel, 177 F.3d 128, 133 (2d Cir. 1999) ("When other substantial evidence in the record conflicts with the treating physician's opinion, however, that opinion will not be deemed controlling. And the less consistent that opinion is with the record as a whole, the less weight it will be given."); Jimenez v. Astrue, 12 Civ. 3477, 2013 WL 4400533 at *10 (S.D.N.Y. Aug. 14, 2013) ("[T]he opinions of a treating physician 'need not be given controlling weight where they are contradicted by other substantial evidence in the record.'"); Van Dien v. Barnhart, 04 Civ. 7259, 2006 WL 785281 at *9 (S.D.N.Y. Mar. 24, 2006) ("[The] general rule of deference does not apply where 'the treating physician issued opinions that are not consistent with other substantial evidence in the record, such as the opinions of other medical experts.'").

[14/]     See also, e.g., Roma v. Astrue, 468 F. App'x 16, 18 (2d Cir. 2012); Priel v. Astrue, 453 F. App'x 84, 86 (2d Cir. 2011); Snell v. Apfel, 177 F.3d 128, 133 (2d Cir. 1999); Cruz v. Colvin, 12 Civ. 7346, 2013 WL 3333040 at *17 (S.D.N.Y. July 2, 2013) (Peck, M.J.), report & rec. adopted, 2014 WL 774966 (S.D.N.Y. Feb. 21, 2014).

such slavish recitation of each and every factor where the ALJ's reasoning and adherence to the regulation are clear."); Halloran v. Barnhart, 362 F.3d 28, 31-32 (2d Cir. 2004) (affirming ALJ opinion which did not discuss the treating physician rule, but where "the substance of the treating physician rule was not traversed").

ALJ Kearns expressly rejected Dr. Harneja's opinion as not well-supported by the underlying medical evidence contained in Dr. Harneja's own mental status examinations and because it was contradicted by Phoenix's independence in activities of daily living and ability to care for her child.

Dr. Harneja's mental status examinations of Phoenix often found her to have intact attention and memory, unimpaired thought processes, normal or euthymic mood, normal reasoning, and intact insight, judgment and impulse control (see pages 4-5, 7-8 above), contradicting Dr. Harneja's claim that his opinion was based on Phoenix's limitations of poor memory and concentration combined with difficulty thinking (R. 293-94, 379; see pages 6-7, 9-10 above). Similarly, Dr. Harneja's opinion regarding possible decompensation was based on Phoenix's self-reporting of a history of losing jobs due to her depression, rather than any medical findings contained in his mental status examinations.  (See pages 7, 10 above.)   Phoenix's statement when she applied for benefits that she could follow instructions, had no problems getting along with superiors, and had never lost a job because of problems getting along with people (see page 2 above) contradicts Dr. Harneja's opinion, based solely on what Phoenix told him, that any stressful situation would cause her to decompensate.  Although Phoenix is correct that ALJ Kearns specifically referred to those statements only in making his credibility determination with regard to Phoenx, rather than when explaining his reason for rejecting Dr. Harneja's opinion (Dkt. No. 22: Phoenix

Reply Br. at 2),[15/] the statements nonetheless support ALJ Kearns' finding that "nothing in the record shows that she has actually decompensated or exhibited any kind of marked mental [disability] despite reporting psychosocial stressors including problems with her children, financial and housing issues." (See page 13 above.)

Moreover, Phoenix was independent in activities of daily living, able to manage her finances, take care of her children, and travel without restriction.  (See pages 2-3 above.)  Phoenix also testified that she was able to take her son to school by public transit, cook, wash, and go to the library, albeit with limitations.  (See page 3 above.)

Dr. Mohamed's mental status examination findings also contradict Dr. Harneja's opinion, as do Dr. Bougakov's findings.  Dr. Mohamed's examination, which occurred before Phoenix began psychiatric treatment, found Phoenix to have moderately severe symptoms, moderate limitation in following work rules, accepting supervision, dealing with the public, relating to co-workers, accepting supervision, maintaining attention, and adapting to stressful situations. (See pages 3-4 above.)  Although Phoenix's GAF score when Dr. Mohamed examined her was fifty, on the borderline between moderate and severe symptoms and limitations (see page 4 above), her subsequent GAF scores have been in the moderate to mildly impaired range (see pages 6, 9, 16-17 above).  Those results are consistent with Dr. Mohamed's conclusion that Phoenix only was

---

[15/]     Phoenix also argues that these statements are of "little, if any, relevance to her functioning during the period at issue" because they allegedly refer only to work she performed prior to her onset date.  (Phoenix Reply Br. at 2.)  The statements at issue, however, are from May 31, 2011, nearly a year after Phoenix's alleged onset date.  (See pages 2-3 above.)  Furthermore, her statements about following instructions and having no problems with people in positions of authority are neither limited to past employers nor limited to dates prior to her alleged onset.  (R. 190.)  Indeed, there is substantial evidence in the record that Phoenix lost her job not because of any psychological problem, but because the client she was caring for was placed in a nursing home. (See page 2 above.)

temporarily disabled from work in mid-2010 and contradict Dr. Harneja's opinion that Phoenix is totally disabled.  Dr. Bougakov's examination of Phoenix found that her attention and memory were intact, that she had fair insight and judgment, and that her memory was only mildly impaired.  (See pages 8-9 above.)  In Dr. Bougakov's opinion, Phoenix's "cognitive symptoms are relatively mild and she does not present with any significant psychiatric symptomatology."  (See page 9 above.)  Dr. Bougakov's opinion thus contradicts Dr. Harneja's opinion, but is consistent with the results of Dr. Harneja's mental status exams as well as with Phoenix's GAF results and Dr. Mohamed's opinion that Phoenix only was temporarily disabled.

Finally, although ALJ Kearns also gave little weight to Punch's opinion from his October 3, 2012 joint letter with Dr. Harneja on the ground that Punch "is not an acceptable medical source withing the meaning of 20 CFR 404.1513(d) and 20 CFR 416.913(d)," ALJ Kearns did not completely reject that opinion; rather, he "did take into account the fact that Mr. Punch suggested that [Phoenix] was capable of tolerating only low work stress, which is accounted for in the residual functional capacity."  (See page 14 above.)[16/]  Because that letter reflects the opinions of both Punch and Dr. Harneja (see pages 10-11 above), ALJ Kearns did not completely reject Dr. Harneja's opinion.  Moreover, Phoenix's treating internist and her hired examining psychiatrist also opined that Phoenix was capable of low stress work, despite her depression.  (See pages 15, 17 above.)

Accordingly, the Court finds that ALJ Kearns' assessment that Phoenix had the capacity to perform work at all exertion levels but limited to "only simple and repetitive tasks, no contact with the public and only occasional contact with supervisors and coworkers" (see page 12 above) is supported by substantial evidence.

---

[16/]    Phoenix does not challenge ALJ Kearns' decision to give little weight to Punch's opinion. (See Phoenix Br. at 10-15.)

### 2.    Credibility Determination

Because subjective symptoms only lessen a claimant's residual functional capacity ("RFC") where the symptoms "'can reasonably be accepted as consistent with the objective medical evidence and other evidence,' the ALJ is not required to accept allegations regarding the extent of symptoms that are inconsistent with the claimant's statements or similar evidence." Moulding v. Astrue, 08 Civ. 9824, 2009 WL 3241397 at *7 (S.D.N.Y. Oct. 8, 2009) (citation & emphasis omitted); see, e.g., Campbell v. Astrue, 465 F. App'x 4, 7 (2d Cir. 2012) ("As for the ALJ's credibility determination, while an ALJ 'is required to take the claimant's reports of pain and other limitations into account,' he or she is 'not require[d] to accept the claimant's subjective complaints without question.'  Rather, the ALJ 'may exercise discretion in weighing the credibility of the claimant's testimony in light of the other evidence in the record.'" (citations omitted)); Genier v. Astrue, 606 F.3d 46, 49 (2d Cir. 2010) ("When determining a claimant's RFC, the ALJ is required to take the claimant's reports of pain and other limitations into account, but is not required to accept the claimant's subjective complaints without question; he may exercise discretion in weighing the credibility of the claimant's testimony in light of the other evidence in the record." (citations omitted)); Brown v. Comm'r of Soc. Sec., 310 F. App'x 450, 451 (2d Cir. 2009) ("Where there is conflicting evidence about a claimant's pain, the ALJ must make credibility findings.").[17]   In

---

[17]/    See also, e.g., Rivers v. Astrue, 280 F. App'x 20, 22 (2d Cir. 2008) (same); Thompson v. Barnhart, 75 F. App'x 842, 845 (2d Cir. 2003) (ALJ properly found that plaintiff's "description of her symptoms was at odds with her treatment history, her medication regime, and her daily routine"); Snell v. Apfel, 177 F.3d 128, 135 (2d Cir. 1999); Norman v. Astrue, 912 F. Supp. 2d 33, 85 (S.D.N.Y. 2012) ("It is 'within the discretion of the [Commissioner] to evaluate the credibility of plaintiff's complaints and render an independent judgment in light of the medical findings and other evidence regarding the true extent of such symptomatology.'"); Astolos v. Astrue, No. 06-CV-678, 2009 WL 3333234 at *12 (W.D.N.Y. Oct. 14, 2009) (ALJ properly determined that plaintiff's subjective pain

(continued...)

addition, "courts must show special deference to an ALJ's credibility determinations because the ALJ had the opportunity to observe plaintiff's demeanor while [the plaintiff was] testifying." Marquez v. Colvin, 12 Civ. 6819, 2013 WL 5568718 at *7 (S.D.N.Y. Oct. 9, 2013).[18/]

When ruling that a claimant is not entirely credible, the ALJ must provide "specific reasons for the finding on credibility, supported by the evidence in the case record."  SSR 96-7p, 1996 WL 374186 at *4 (July 2, 1996).  The regulations set out a two-step process for assessing a claimant's statements about pain and other limitations:

> At the first step, the ALJ must decide whether the claimant suffers from a medically determinable impairment that could reasonably be expected to produce the symptoms alleged. . . . If the claimant does suffer from such an impairment, at the second step, the ALJ must consider the extent to which the claimant's symptoms can reasonably be accepted as consistent with the objective medical evidence and other evidence of record.  The ALJ must consider statements the claimant or others make about his impairments, his restrictions, his daily activities, his efforts to work, or any other relevant statements he makes to medical sources during the course of examination or treatment, or to the agency during interviews, on applications, in letters, and in testimony in its administrative proceedings.

---

[17/]   (...continued)
complaints were not supported by the medical record); Speruggia v. Astrue, No. 05-CV-3532, 2008 WL 818004 at *11 (E.D.N.Y. Mar. 26,  2008) ("The ALJ 'does not have to accept plaintiff's subjective testimony about her symptoms without question' and should determine a plaintiff's credibility 'in light of all the evidence.'"); Soto v. Barnhart, 01 Civ. 7905, 2002 WL 31729500 at *6 (S.D.N.Y. Dec. 4, 2002) ("The ALJ has the capacity and the discretion to evaluate the credibility of a claimant and to arrive at an independent judgment, in light of medical findings and other evidence, regarding the true extent of pain alleged by the claimant."); Brandon v. Bowen, 666 F. Supp. 604, 608 (S.D.N.Y. 1987) (same).

[18/]   Accord, e.g., Campbell v. Astrue, 465 F. App'x at 7 ("[W]e have long held that '[i]t is the function of the [Commissioner], not ourselves, . . . to appraise the credibility of witnesses, including the claimant.'"); Nunez v. Astrue, 11 Civ. 8711, 2013 WL 3753421 at *7 (S.D.N.Y. July 17, 2013); Guzman v. Astrue, 09 Civ. 3928, 2011 WL 666194 at *7 (S.D.N.Y. Feb. 4, 2011); Ruiz v. Barnhart, 03 Civ. 10128, 2006 WL 1273832 at *7 (S.D.N.Y. May 10, 2006); Gernavage v. Shalala, 882 F. Supp. 1413, 1419 & n.6 (S.D.N.Y. 1995); Mejias v. Soc. Sec. Admin., 445 F. Supp. 741, 744 (S.D.N.Y. 1978) (Weinfeld, D.J.); Wrennick v. Sec'y of Health, Educ. & Welfare, 441 F. Supp. 482, 485 (S.D.N.Y. 1977) (Weinfeld D.J.).

Genier v. Astrue, 606 F.3d at 49 (quotations, citation & brackets omitted).[19/]

Phoenix argues that ALJ Kearns' credibility determination is not supported by substantial evidence because "his findings related to [Phoenix's] credibility largely mirror the flawed reasoning given for rejecting the opinions from treating psychiatrist Harneja" and because Phoenix's "detailed testimony" concerning her limitations is "consistent with the underlying record." (Dkt. No. 17: Phoenix Br. at 17.)

ALJ Kearns determined that Phoenix "was not fully credible to the extent that she felt her psychological impairments prevented her from working." (See page 13 above.) ALJ Kearns noted that Phoenix certified in her May 31, 2011 Adult Function Report that "she could follow spoken and written instructions, has no problems getting along with authority figures and she had never lost her job due to problems getting along with people." (See page 13 above.) ALJ Kearns also observed that Phoenix stated during her July 15, 2010 FEGS examination that she could perform activities of daily living and "also told a FEGS social worker . . . that she was not interested in working." (R. 37; see page 13 above.) ALJ Kearns concluded that "the record shows that [Phoenix] has no limitations with respect to traveling independently, managing money and caring for her children." (See page 13 above.) ALJ Kearns found that Phoenix's treatment record "primarily consists of the same essentially normal mental status examinations through 2011 and a one-time FEGS examination in 2010. Despite the fact that she [stated] throughout the examinations that depression and anxiety prevent her from functioning, she usually attributed her psychological symptoms to life stressors." (See page 13 above.)

---

[19/]   Accord, e.g., Cichocki v. Astrue, 534 F. App'x 71, 75-76 (2d Cir. 2013); Campbell v. Astrue, 465 F. App'x at 7; Meadors v. Astrue, 370 F. App'x 179, 183 (2d Cir. 2010); Taylor v. Barnhart, 83 F. App'x 347, 350-51 (2d Cir. 2003); 20 C.F.R. § 416.945(a)(1), (3); SSR 96-7p, 1996 WL 374186 at *2.

Thus, in determining that Phoenix's claim to be unable to work was not fully credible, ALJ Kearns relied upon the clinical observations of Dr. Harneja and Dr. Mohamed, as well as Phoenix's stated activity level.  All of these sources support ALJ Kearns' credibility determination.

Dr. Harneja's mental status examinations repeatedly found that Phoenix essentially had normal memory, attention, reasoning and thought processes.  (See pages 4-5, 7-8 above.)  Both of Phoenix's GAF scores from Dr. Harneja indicate only moderate to borderline mild impairments.  (See page 6, 9 above.)  Dr. Harneja's December 2, 2011 opinion that Phoenix could perform low-stress work because she was only mildly limited in her ability to understand and remember simple one or two-step instructions and moderately limited in dealing appropriately with the general public, maintaining socially appropriate behavior, and in responding appropriately to changes in the work place (see pages 9-10 above) contradicts Phoenix's claim of disabling symptoms.

Phoenix's statements regarding her activities similarly contradict her claim of disabling depression.  Phoenix lives alone with her young son, whom she takes to school by public transportation.  (See page 3 above.)  Phoenix told Dr. Harneja on several occasions that she felt better with medication (see pages 5, 8 above), and Dr. Harneja's mental status examinations showing that Phoenix displayed a normal, euthymic, or intermittent low mood, support those statements, as do Bronx Lebanon Hospial's records indicating that Phoenix was making incremental progress (see pages 5, 7-8 above).  Far from claiming that her depression was disabling, Phoenix told FEGS that she was not interested in working because she was a single parent caring for her children.  (See page 4 above.)  Although Phoenix complained at her hearing of adverse side effects from her medication (see page 3 above), she told Dr. Harneja that she had no side effects from medication (see pages 7-8 above).  Finally, Phoenix's statements to Dr. Harneja about experiencing workplace episodes or deterioration or decompensation as a result of irritability in accepting instructions and

being around co-workers (see page 7, 10 above) are inconsistent with her statement in her Adult Function Report that she had never had any problems getting along with supervisors or others, and also inconsistent with losing her last job because her client was placed in a nursing home (see page 2 above).

Thus, ALJ Kearns met his burden in finding Phoenix not entirely credible because the objective medical evidence and her stated independence in activities of daily living failed to support her claims of disability based on her depression. E.g., Hilliard v. Colvin, 13 Civ. 1942, 2013 WL 5863546 at *15 (S.D.N.Y. Oct. 31, 2013) (Peck, M.J.) (The "ALJ . . . met his burden in finding [plaintiff's] claims not entirely credible because she remains functional in terms of activities of daily living and the objective medical evidence fails to support her claims of total disability based on pain." (citations omitted)); see, e.g., Stanton v. Astrue, 370 F. App'x 231, 234 (2d Cir. 2010) (the court will not "second-guess the credibility finding . . . where the ALJ identified specific record-based reasons for his ruling"); Rutkowski v. Astrue, 368 F. App'x 226, 230 (2d Cir. 2010) (ALJ adequately supported credibility finding when he noted that "substantial evidence existed showing that [plaintiff] was relatively 'mobile and functional,' and that [plaintiff's] allegations of disability contradicted the broader evidence"); Aman v. Colvin, No. 12-CV-6520, --- F. Supp. 3d ----, 2014 WL 4543011 at *4 (W.D.N.Y. Sep. 11, 2014) (ALJ properly found plaintiff's testimony that her allegedly disabling depression and anxiety rendered her nearly immobile and unable to maintain relationships with others not credible in light of "plaintiff's self-reports of leaving the house nearly every day to grocery shop or perform other errands, and her engagement in cooking, cleaning, driving, home decorating and spending time with family."); Castaldo v. Astrue, No. 11-CV-322, 2012 WL 2847904 at *4 (W.D.N.Y. July 11, 2012) (where plaintiff's subjective reports of her allegedly disabling depression and anxiety were not supported by her psychologist's mental

impairment questionnaire answers, "[t]he ALJ was entitled to make a credibility determination as to Plaintiff's subjective symptoms [of depression and anxiety].  In so doing, and in finding Plaintiff not credible, the ALJ was free to give her psychologist's opinion less weight on the ground that it was based primarily on her personal assessment of her symptoms and limitations."); Conte v. Astrue, No. 08-CV-01185, 2010 WL 2730661 at *10 (N.D.N.Y. June 21, 2010) (ALJ's determination that plaintiff's claims of disability based on depression, anxiety and other mental impairments were not credible was supported by plaintiff's improvement due to medication, successful completion of her first year of college, statements that she was a responsible worker, volunteer activities, and work as a babysitter.), report & rec. adopted, 2010 WL 2730652 (N.D.N.Y. July 7, 2010).[20]

---

[20]    See also, e.g., Givens v. Colvin, 13 Civ. 4763, 2014 WL 1394965 at *10-11 (S.D.N.Y. Apr. 11, 2014) (Peck, M.J.) (ALJ properly found claimant's disability claims not entirely credible where claimant "admitted that he was capable of performing many day-to-day activities, such as reading, watching television, caring for his personal needs, using public transportation, and going to church"); Crayton v. Astrue, 944 F. Supp. 2d 231, 235 (W.D.N.Y. 2013) ("Plaintiff also challenges the ALJ's finding that plaintiff's complaints of disabling pain were not wholly credible. . . . Here, the ALJ rejected plaintiff's testimony based on several inconsistencies. . . . [P]laintiff's complaints of disabling pain appear to conflict with her medical treatment records, which reflect few complaints and no aggressive or additional treatment for back, knee and wrist pain . . . . For example, plaintiff listed, among her activities of daily living, dressing and caring for herself, performing light housework and grocery shopping, and stated that she could lift ten pounds . . . . Given the inconsistencies between plaintiff's reports of disabling pain, other testimony by plaintiff and the rest of the record, I find no basis to disturb the ALJ's findings as to plaintiff's credibility."); Gillard v. Colvin, No. 11-cv-1173, 2013 WL 954909 at *5 (N.D.N.Y. Mar. 12, 2013) (Plaintiff "next asserts that the ALJ erred in assessing his credibility by improperly concluding that his activities of daily living, including smoking . . . undercut his claims of disability.  The court disagrees. . . . As the ALJ explained, [plaintiff's] claims of limitation were belied by [his] . . . activities of daily living includ[ing] showering, bathing, and dressing himself, preparing microwave meals, watching television, listening to the radio, reading, and socializing.  Further, [plaintiff] smokes daily, which the ALJ observed requires manipulative and fine motor activity, despite his allegations of limitation in the use [of his] hands and fingers.  In sum, the ALJ's credibility determination was sufficiently articulate and based on substantial evidence and is, therefore, conclusive." (record citations omitted)); Ashby v. Astrue, 11 Civ. 2010, 2012 WL 2477595 at *15 (S.D.N.Y. Mar. 27, 2012) ("in
                                                                                                        (continued...)

This Court might have reached a different credibility or RFC determination than that of the ALJ, but the standard is not de novo review but whether substantial evidence supports the ALJ's decision.  The Court finds that it does.

### E.     Phoenix Did Not Have The Ability To Perform Her Past Relevant Work

The fourth step of the five-step analysis asks whether Phoenix had the residual functional capacity to perform her past relevant work.  (See page 21 above.)  ALJ Kearns found that Phoenix "is incapable of performing her past relevant jobs because they are too mentally demanding."  (R. 38; see page 14 above.)  Because ALJ Kearns' findings at this stage benefit Phoenix, the Court proceeds to step five of the five-step analysis.

### F.     Phoenix Had The Ability To Perform Other Work In The National Economy

In the fifth step, the burden shifts to the Commissioner, "who must produce evidence to show the existence of alternative substantial gainful work which exists in the national economy and which the claimant could perform, considering not only his physical capability, but as well his age, his education, his experience and his training."  Parker v. Harris, 626 F.2d 225, 231 (2d Cir. 1980).[21]

In meeting his burden under the fifth step, the Commissioner:

_____

[20]     (...continued)
making his credibility assessment, the ALJ appropriately considered Plaintiff's ability to engage in certain daily activities as one factor, among others suggested by the regulations"), report & rec. adopted, 2012 WL 2367034 (S.D.N.Y. June 20, 2012).

[21]     See, e.g., Roma v. Astrue, 468 F. App'x 16, 20 (2d Cir. 2012); Arruda v. Comm'r of Soc. Sec., 363 F. App'x 93, 95 (2d Cir. 2010); Butts v. Barnhart, 388 F.3d 377, 381 (2d Cir. 2004), amended on other grounds, 416 F.3d 101 (2d Cir. 2005); Rosa v. Callahan, 168 F.3d 72, 77 (2d Cir. 1999).

> may rely on the medical-vocational guidelines contained in 20 C.F.R. Part 404, Subpart P, App. 2, commonly referred to as "the Grid".  The Grid takes into account the claimant's residual functional capacity in conjunction with the claimant's age, education and work experience.  Based on these factors, the Grid indicates whether the claimant can engage in any other substantial gainful work which exists in the national economy.  Generally the result listed in the Grid is dispositive on the issue of disability.

Zorilla v. Chater, 915 F. Supp. 662, 667 (S.D.N.Y. 1996) (fn. omitted); see, e.g., Heckler v. Campbell, 461 U.S. 458, 461-62, 465-68, 103 S. Ct. 1952, 1954-55, 1956-58 (1983) (upholding the promulgation of the Grid); Roma v. Astrue, 468 F. App'x at 20-21; Martin v. Astrue, 337 F. App'x 87, 90 (2d Cir. 2009); Rosa v. Callahan, 168 F.3d at 78; Perez v. Chater, 77 F.3d 41, 46 (2d Cir. 1996); Bapp v. Bowen, 802 F.2d 601, 604 (2d Cir. 1986).

However, "relying solely on the Grids is inappropriate when nonexertional limitations 'significantly diminish' plaintiff's ability to work so that the Grids do not particularly address plaintiff's limitations."  Vargas v. Astrue, 10 Civ. 6306, 2011 WL 2946371 at *13 (S.D.N.Y. July 20, 2011); see also, e.g., Travers v. Astrue, 10 Civ. 8228, 2011 WL 5314402 at *10 (S.D.N.Y. Nov. 2, 2011) (Peck, M.J.), report & rec. adopted, 2013 WL 1955686 (S.D.N.Y. May 13, 2013); Lomax v. Comm'r of Soc. Sec., No. 09-CV-1451, 2011 WL 2359360 at *3 (E.D.N.Y. June 6, 2011) ("Sole reliance on the grids is inappropriate, however, where a claimant's nonexertional impairments 'significantly limit the range of work permitted by his exertional limitations.'").

Rather, where the claimant's nonexertional limitations "'significantly limit the range of work permitted by his exertional limitations,' the ALJ is required to consult with a vocational expert."  Zabala v. Astrue, 595 F.3d 402, 410 (2d Cir. 2010) (quoting Bapp v. Bowen, 802 F.2d at 605); see also, e.g., Selian v. Astrue, 708 F.3d 409, 421 (2d Cir. 2013) ("We have explained that the ALJ cannot rely on the Grids if a non-exertional impairment has any more than a 'negligible' impact on a claimant's ability to perform the full range of work, and instead must obtain the testimony of

a vocational expert."); <u>Rosa</u> v. <u>Callahan</u>, 168 F.3d at 82 ("Where significant nonexertional impairments are present at the fifth step in the disability analysis, however, 'application of the grids is inappropriate.'  Instead, the Commissioner 'must introduce the testimony of a vocational expert (or other similar evidence) that jobs exist in the economy which claimant can obtain and perform.'" (quoting & citing <u>Bapp</u> v. <u>Bowen</u>, 802 F.2d at 603, 605-06)); <u>Suarez</u> v. <u>Comm'r of Soc. Sec.</u>, No. 09-CV-338, 2010 WL 3322536 at *9 (E.D.N.Y. Aug. 20, 2010) ("If a claimant has nonexertional limitations that 'significantly limit the range of work permitted by his exertional limitations,' the ALJ is required to consult with a vocational expert." (quoting <u>Zabala</u> v. <u>Astrue</u>, 595 F.3d at 411)).

ALJ Kearns properly relied on the testimony of vocational expert Green to find that jobs exist in the national economy in significant numbers that Phoenix could perform.  (See page 14 above.)[22]  Green testified that a hypothetical individual who could work at all exertion levels, but could only perform simple and repetitive tasks with no public contact and only occasional contact with supervisors or co-workers could perform several jobs in the national economy.  (See page 11

---

[22]   A vocational expert can provide evidence regarding the existence of jobs in the economy and a particular claimant's functional ability to perform any of those jobs.  20 C.F.R. §§ 404.1566(e), 416.966(e); <u>see</u>, <u>e.g.</u>, <u>Calabrese</u> v. <u>Astrue</u>, 358 F. App'x 274, 275-76 (2d Cir. 2009); <u>Butts</u> v. <u>Barnhart</u>, 416 F.3d at 103-04; <u>Taylor</u> v. <u>Barnhart</u>, 83 F. App'x 347, 350 (2d Cir. 2003); <u>Jordan</u> v. <u>Barnhart</u>, 29 F. App'x 790, 794 (2d Cir. 2002); <u>Rautio</u> v. <u>Bowen</u>, 862 F.2d 176, 180 (8th Cir. 1988); <u>Dumas</u> v. <u>Schweiker</u>, 712 F. 2d 1545, 1553-54 (2d Cir. 1983); <u>DeJesus</u> v. <u>Astrue</u>, 762 F. Supp. 2d 673, 693 n.20 (S.D.N.Y. 2011) (Peck, M.J.); <u>Quezada</u> v. <u>Barnhart</u>, 06 Civ. 2870, 2007 WL 1723615 at *13 n.20 (S.D.N.Y. June 15, 2007) (Peck, M.J.); <u>Snipe</u> v. <u>Barnhart</u>, 05 Civ. 10472, 2006 WL 2390277 at *18 (S.D.N.Y. Aug. 21, 2006) (Peck, M.J.), <u>report & rec. adopted</u>, 2006 WL 2621093 (S.D.N.Y. Sept. 12, 2006); <u>De Roman</u> v. <u>Barnhart</u>, 03 Civ. 0075, 2003 WL 21511160 at *17 (S.D.N.Y. July 2, 2003) (Peck, M.J.); <u>Bosmond</u> v. <u>Apfel</u>, 97 Civ. 4109, 1998 WL 851508 at *8 (S.D.N.Y. Dec. 8, 1998); <u>Fuller</u> v. <u>Shalala</u>, 898 F. Supp. 212, 218 (S.D.N.Y. 1995) (The "vocational expert, . . . provided several examples of unskilled . . . jobs that are available in the national and local economies for a person with [plaintiff's] condition, age, education, and work experience. . . . Accordingly, the Secretary satisfied her burden of showing that such jobs exist in the national economy.").

above.)  In particular, Green opined that such a hypothetical individual could work as an addresser, a sorter or a stuffer, all unskilled sedentary jobs.  (See page 11 above.)  ALJ Kearns relied upon the vocational expert's testimony in reaching his conclusion when he specifically referred to those three jobs in his findings.  (See page 14 above.)

ALJ Kearns also was not required to rely on Green's testimony that an individual who missed work two or three times per month would not be able to work at any of the jobs she identified.  An ALJ has the authority to disregard a vocational expert's testimony where it is inconsistent with the underlying evidence.  See, e.g., Krach v. Comm'r of Soc. Sec., No. 13-CV-1089, 2014 WL 5290368 at *11 (N.D.N.Y. Oct. 15, 2014) ("[T]here must be 'substantial [record] evidence to support the assumption upon which the vocational expert based his opinion.'" (quoting Dumas v. Schweiker, 712 F.2d 1545, 1554 (2d Cir. 1983)); Armstrong v. Comm'r of Soc. Sec., No. 06-CV-1049, 2009 WL 2883046 at *6 (N.D.N.Y. Sept. 4, 2009) (substantial evidence supported ALJ's finding that work existed in the national economy that plaintiff could perform even though ALJ reached that conclusion notwithstanding vocational expert testimony that excessive absenteeism would impair  a hypothetical employee's ability to work because the hypothetical limitations posed to the vocational expert were not supported by objective medical evidence); cf. Gannett v. Colvin, No. 13-CV-717, 2014 WL 7345694 at *8 (N.D.N.Y. Dec. 23, 2014) (even though "vocational experts in other cases have opined that missing three or more days of work per month may render a claimant unemployable," ALJ did not err in finding plaintiff not disabled because ALJ properly weighed the medical evidence in deciding to give only limited weight to social worker's opinion that plaintiff would be absent that frequently).

Green's testimony was in response to a hypothetical posed by Phoenix's counsel based on Dr. Harneja's opinion.  (See page 11 above.)  To the extent that Dr. Harneja's opinion about how

frequently Phoenix would miss work reflects his opinion that Phoenix is disabled, ALJ Kearns already determined that the underlying records do not support that opinion.  (See pages 13-14 above.)  Moreover, to the extent that Dr. Harneja's opinion was based on the frequency with which Phoenix could be expected to miss work for medical treatment, her treatment history, as reflected in the record, does not indicate that she normally received treatment more than once per month.  ALJ Kearns had the authority to disregard Green's testimony on this point.

## III.   THE EVIDENCE SUBMITTED TO THE APPEALS COUNCIL SUPPORTS THE COMMISSIONER'S DECISION

In support of her request for Appeals Council review, Phoenix submitted treatment records and an impairment questionnaire from her treating physician Dr. Dove as well as a report and impairment questionnaire from Dr. Lynch, who was retained by her counsel for purposes of the administrative appeal.  (See pages 15-17 above.)  When a claimant submits new and material evidence to the Appeals Council upon a request for review of the ALJ's decision and the Appeals Council denies review, the evidence becomes part of the record.  Perez v. Chater, 77 F.3d 41, 45 (2d Cir. 1996); Jones v. Apfel, 66 F. Supp. 2d 518, 525 (S.D.N.Y. 1999) (Pauley, D.J. & Peck, M.J.).  The Court then must review the amended administrative record to determine whether there is substantial evidence to support the Commissioner's decision.  Perez v. Chater, 77 F.3d at 46; Jones v. Apfel, 66 F. Supp. 2d at 536.

The Appeals Council considered Phoenix's new evidence but concluded that "this information does not provide a basis for changing the [ALJ's] decision."  (See page 17 above.)  The Appeals Council did not further elaborate on Dr. Dove's records.  (See page 17 above.)  With respect to Dr. Lynch, however, the Appeals Council noted that "[t]his new information is about a later time.  Therefore, it does not affect the decision about whether [Phoenix was] disabled beginning on or

before October 18, 2012." (See page 17 above.)  Phoenix argues that Dr. Dove's records further support Dr. Harneja's opinion that Phoenix is disabled and that the Appeals Council erred in finding that Dr. Lynch's opinion did not relate to the relevant time period.  (Dkt. No. 17: Phoenix Br. at 18-19.)  According to Phoenix, even though Dr. Lynch gave his opinion several months after ALJ Kearns' decision, his opinion related to the period at issue because "Dr. Lynch stated that the symptoms and limitations found for [Phoenix] were present for years based not only on his evaluation, but also [on] treatment records from the period at issue."  (Phoenix Br. at 19, record citations omitted.)

The Court agrees with the Appeals Council that Dr. Dove's records do not provide a basis for changing ALJ Kearns' decision.  Dr. Dove's records for the relevant time period contain no mental status examination findings other than an unelaborated-upon (and undisputed) diagnosis of anxiety and depressive disorders.  (See pages 15-16 above).  And although Dr. Dove noted in his multiple impairment questionnaire that Phoenix could miss work as many as three times per month, that conclusion was not supported by any specific medical reasoning or evidence aside from a note that Phoenix's difficulty sleeping contributed to the severity of her symptoms.  (See page 15 above.)  In the very same multiple impairment questionnaire, Dr. Dove also opined that Phoenix's impairments would last less than twelve months, that Phoenix was capable of low stress work, and that she did not need to take unscheduled breaks at unpredictable intervals during an eight hour work day.  (See page 15 above.)  Dr. Dove specifically found that Phoenix's prognosis was "good." (See page 15 above.)

The Court also agrees that Dr. Lynch's records pertain to a later time.  An opinion from a physician who did not provide treatment during the period in question is not relevant to determining a claimant's disability unless it reveals that the claimant's condition was far more

serious than previously thought.  See, e.g., Newbury v. Astrue, 321 F. App'x 16, 18 n.2 (2d Cir.

2009) ("We note that we have held that medical evidence generated after an ALJ's decision cannot

[be] deemed irrelevant solely because of timing.  For example, subsequent evidence of the severity

of a claimant's condition may demonstrate that 'during the relevant time period, [the claimant's]

condition was far more serious than previously thought.'"); Florek v. Comm'r of Soc. Sec., No. 08-

CV-0919, 2009 WL 3486643 at *11 (N.D.N.Y. Oct. 21, 2009) (psychological examination

performed after ALJ's decision did not satisfy materiality criteria for Appeals Council consider

because examiner's assessments "post-date[] the ALJ 's decision by nearly eleven months and [did]

not relate to the period on or before the date of the ALJ's decision" and did "not reveal that plaintiff's

impairment was substantially more severe than previously diagnosed"); Xu v. Barnhart, No. CV-04-

3927, 2006 WL 559263 at *7 (E.D.N.Y. Mar. 7, 2006) ("A diagnosis that post-dates an

administrative hearing may be considered new evidence relating to the relevant time period only if

it reveals that a claimant 'had an impairment substantially more severe than was previously

diagnosed.'").

     Dr. Lynch only examined Phoenix on February 15, 2013, nearly four months after

ALJ Kearns issued his decision.  (See page 16 above.)  While Dr. Lynch reviewed Phoenix's

treatment records from Bronx Lebanon Hospital and from Dr. Dove (see page 16 above), he also

observed Phoenix as displaying symptoms that no examining source found during the relevant

period, such as psychomotor agitation and paranoia (see page 17 above).  To the extent that Dr.

Lynch's opinion is based on symptoms not present in Phoenix's records from the time period at issue,

it is irrelevant because it pertains to her ability to work after ALJ Kearns rendered his decision.  To

the extent Dr. Lynch's opinion is based instead on Dr. Dove's records, those records are inconsistent

with the opinion that Phoenix is disabled since Dr. Dove found her capable of low stress work and

opined that there was no reason to believe her condition would last longer than twelve months. (See page 15 above.)  Similarly, to the extent that Dr. Lynch's opinion is based on Dr. Harneja's mental status examination records, the ALJ already found that those records do not support the opinion that Phoenix is disabled.  (See pages 13-14 above.)

### CONCLUSION

For the reasons discussed above, the Commissioner's determination that Phoenix was not disabled within the meaning of the Social Security Act is supported by substantial evidence. The Commissioner's motion for judgment on the pleadings (Dkt. No. 20) is GRANTED and Phoenix's motion for judgment on the pleadings (Dkt. No. 16) is DENIED.  The Clerk of Court shall close the case.

SO ORDERED.

Dated:       New York, New York
             February 4, 2015

_____
**Andrew J. Peck**
United States Magistrate Judge

Copies ECF to:       All Counsel